# Supreme Court of Texas

---

No. 23-0048

---

Ford Motor Company,

*Petitioner*,

v.

Jennifer Parks, Individually and as Guardian of the Person and Estate of Samuel Rivera Gama, and Nicolasa Gama Dale,

*Respondents*

---

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

---

**Argued February 21, 2024**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

As applied here, the statute of repose requires that a products-liability action be brought within 15 years of the sale of a product.[1] Plaintiffs do not dispute that the vehicle in question was transferred from Ford to its dealer to the customer more than 15 years before the plaintiffs filed suit, but the court of appeals reversed summary judgment for Ford because it did not prove the exact date the dealer paid for the

---

[1] TEX. CIV. PRAC. & REM. CODE § 16.012(b).

vehicle in full.[2] We hold that such proof is not required and that Ford conclusively established its entitlement to repose. We reverse the court of appeals' judgment and render judgment for Ford.

## I

## A

Samuel Gama suffered serious injuries when his 2001 Ford Explorer Sport rolled over on the President George Bush Turnpike. Two years later, on May 17, 2016, Gama's wife, Jennifer Parks, brought products-liability claims individually and as Gama's guardian against Ford Motor Company. Parks alleged that the Explorer's design made it unstable and prone to rollovers and that the design of its roof and restraint system increased the risk of injury in a crash. Ford moved for summary judgment, arguing that Parks' suit is foreclosed by the statute of repose in Section 16.012(b) of the Texas Civil Practice and Remedies Code. With exceptions not applicable here, "a claimant must commence a products liability action against a manufacturer or seller of a product before the end of 15 years after the date of the sale of the product by the defendant."[3]

The proceedings were protracted and winding. Both sides' arguments evolved in the three years between Ford's initial summary-judgment motion and the trial court order being appealed. The trial court granted Ford's initial summary-judgment motion; then vacated that order and granted Parks' motion for new trial; then denied Ford's

---

[2] ___ S.W.3d ___, 2022 WL 17423590 (Tex. App.—Dallas Dec. 6, 2022).

[3] TEX. CIV. PRAC. & REM. CODE § 16.012(b).

2

renewed summary-judgment motion; then denied Ford's motion for reconsideration of that order; before reversing course again and granting yet another summary-judgment motion by Ford, which was the court's final order.

When all was said and done, the evidence that Ford sold the Explorer to a dealership more than 15 years before Parks filed suit was overwhelming. Ford's witnesses were Robert Pascarella, an engineer with Ford since 1989, and Michael O'Brien, a 28-plus-year Ford employee[4] who was serving as its U.S. Sales Strategy Manager when his testimony was taken. With respect to Pascarella, the evidence included two affidavits he made for this case and his deposition in *Camacho v. Ford Motor Co.*, a similar case then-pending in federal court.[5] With respect to O'Brien, the evidence included his affidavit in this case, his deposition in this case, and his deposition in *Camacho*. Ford's documentary evidence included a "Mini 999" report and a vehicle information report for the Explorer, which are compilations of data recorded by Ford or a dealership in the NAVIS (North American Vehicle Invoicing System) database; Ford's Sales and Service Agreement with dealerships; and its Vehicle Terms of Sale Bulletin, which is incorporated by reference into the Sales and Service Agreement.

The Mini 999 report, vehicle information report, and Pascarella's affidavit testimony establish that the Explorer was manufactured by Ford at its Louisville, Kentucky plant on May 8, 2000; that Ford

---

[4] O'Brien testified at his December 2020 deposition in this case that he had been employed by Ford for 28 1/2 years.

[5] 993 F.3d 308 (5th Cir. 2021).

3

"released" the Explorer to the Town East Ford dealership in Mesquite, Texas on May 9, 2000; that the Explorer was shipped or delivered to Town East on May 12, 2000; and that Town East sold or leased the Explorer to a retail customer in June 2000.[6] At the deposition taken in this case, O'Brien testified that Ford sells its vehicles to independently owned Ford and Lincoln franchise dealers and that it never sells or leases new vehicles directly to the public. "All sales are done through our dealership network", and leases are "also done through dealerships", he said.[7] O'Brien then explained that after a vehicle leaves the assembly line, "it is at that point released to the carrier, and the release to the carrier is the trigger point in which the dealership pays us for the vehicle and the vehicle becomes what is essentially sold to the dealer."

O'Brien was asked about Ford's sales process multiple times, and each time he gave the same answer. "[W]e sell it one time and that is to the dealership." "[U]pon delivery to the carrier" is "when Ford gets its money[,] and . . . that's the only sale that . . . Ford records. Obviously there's a subsequent sale to an end user that gets reported back to us,

---

[6] Pascarella's September 2019 affidavit states that the Mini 999 report for the Explorer reflects that Town East reported that it sold the Explorer to a retail customer. Parks filed an affidavit of Charles Stewart, who averred that he leased the Explorer from Town East for three years beginning June 30, 2000. It does not matter to our analysis whether Town East sold or leased the Explorer to Stewart.

[7] In Texas, vehicle manufacturers are prohibited by law from selling new vehicles directly to the public. *See* TEX. OCC. CODE § 2301.252(a) ("A person may not engage in the business of buying, selling, or exchanging new motor vehicles unless the person: (1) holds a franchised dealer's license issued under this chapter . . . ; or (2) is a bona fide employee of the holder of a franchised dealer's license.").

4

but the only sale Ford makes directly is that one to the dealer." O'Brien also explained how a dealership typically pays Ford. "They often have a line of credit with a bank"—which is called floorplan financing—"and so we draft that bank on that simultaneous with [the vehicle's] being released . . . from the plant . . . ." When asked if every vehicle is sold the same way, O'Brien responded, "[y]es."

O'Brien was questioned about Ford's Sales and Service Agreement, which he described as "essentially the binding document between Ford Motor Company and the dealer", as well as Ford's Vehicle Terms of Sale Bulletin. Under paragraph 11(a) of the Agreement, "[p]ayment by the Dealer for each Company Product shall be in accordance with the terms and conditions set forth in" the Bulletin.[8] Under paragraph 11(b), "[t]itle to each Company Product purchased by the Dealer shall (unless otherwise provided in the [Bulletin]) pass to the Dealer, or to such financing institution or other party as may have been designated to the Company by the Dealer, upon delivery thereof to the carrier or to the Dealer, whichever occurs first". But "the Company shall retain a security interest in and right to repossess any product until paid therefor", it says. The Bulletin, in turn, reiterates that "[t]he Dealer shall pay the Company for each Vehicle . . . sold to the Dealer the Wholesale Delivered Price" upon "delivery of the Vehicle to the Dealer or the carrier, whichever occurs first".

O'Brien was also questioned about the Explorer's Mini 999 report and the NAVIS database the report pulls information from. O'Brien

---

[8] For readability, words appearing in all caps in the Agreement or the Bulletin are merely capitalized here.

5

testified that the database and the Mini 999 report both refer to the point at which a dealership becomes the owner of a vehicle as "the release". When asked what release date is listed for the Explorer, O'Brien responded "May 9th of 2000".

Pascarella and O'Brien also described Ford's sales process when they were deposed in *Camacho*. Pascarella testified that a vehicle's release date is "the date the vehicle was shipped from wherever Ford had the vehicle to the dealer, and that's when essentially payment is due from the dealer for those vehicles." O'Brien's testimony is consistent: The "release" date in the Mini 999 report is when the vehicle is released from Ford "[t]o the carrier for delivery to the dealership, . . . and the dealer obtains ownership at that point." The dealership's payment for a vehicle "would be drafted on the day that the vehicle gets handed to the carrier". "Theoretically the dealer could pay in cash, but then what happens in reality is the dealer has a floor plan" line of credit, and any vehicle that it purchases is "drafted against that floor plan source." This occurs on the release date, O'Brien affirmed again.

In sum, Ford's evidence establishes the following timeline:

- **Ford released** the Explorer to the Town East Ford dealership on **May 9, 2000**;
- The Explorer was shipped or delivered to Town East on May 12, 2000;
- Town East sold or leased the Explorer to a retail customer in June 2000; and
- **Parks filed** suit on **May 17, 2016**.

Parks does not challenge these dates. Nor did she put on any evidence of her own to controvert Ford's evidence of its process for selling vehicles to a dealership.

6

**B**

Ford's final, successful summary-judgment motion urged the trial court to follow *Camacho*, in which a federal district court granted summary judgment for Ford under Section 16.012(b). The Fifth Circuit had affirmed that summary judgment[9] by the time the court of appeals decided Parks' appeal in this case. The Fifth Circuit's opinion provides context for the court of appeals' opinion below and the parties' arguments in this Court.

The facts of *Camacho* are analogous. The Camacho family was injured when their 2004 Ford truck rolled over in 2017. They filed suit against Ford in federal district court in Texas in January 2019, alleging products-liability claims under Texas law. Ford presented the same kinds of summary-judgment evidence in *Camacho* that it has presented here.

After observing that Section 16.012 does not define *sale* and that this Court has not addressed how to measure "the date of the sale of the product by the defendant", the Fifth Circuit employed "the same methods of statutory interpretation [we] use[]"[10] to hold that:

- *sale* in Section 16.012(b) means the same as its dictionary definition and as its definition in Section 2.106(a) of the Uniform Commercial Code[11]—"the passing of title from the seller to the buyer for a price";[12] and

---

[9] *Camacho*, 993 F.3d at 310.

[10] *Id.* at 311.

[11] *See id.* at 312-313.

[12] TEX. BUS. & COM. CODE § 2.106(a); *Sale*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The transfer of property or title for a price." (citing

7

- Ford sold the truck at issue on the date in 2003 that it released the truck to the dealership for the price of $25,725.23.[13]

The Fifth Circuit expressly rejected plaintiffs' argument that "the way the dealership financed the purchase" is relevant to the sales date—indeed, it called the financing arrangements "irrelevant".[14] For support, the Fifth Circuit again looked to the UCC, this time Section 2.401(b), which states that "despite any reservation of a security interest", "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods".[15] Finally, the Fifth Circuit confirmed that it does not "matter that Ford refers to the sale as a 'release[]'" because "industry jargon has no bearing on the question . . . whether a sale legally occurred."[16]

## C

Before the court of appeals, Parks did not contest that *sale* in Section 16.012(b) has the meaning set out in the UCC or that Ford released the Explorer to Town East on May 9, 2000. She argued that Ford is required to establish the specific date on which Town East paid Ford for the Explorer in full and that Ford has not done so. The court agreed.[17]

---

UCC § 2-106(1))).

[13] *Camacho*, 993 F.3d at 313.

[14] *Id.*

[15] TEX. BUS. & COM. CODE § 2.401(b), *cited in Camacho*, 993 F.3d at 313 n.28. This is the case "even though a document of title is to be delivered at a different time or place". *Id.*

[16] *Camacho*, 993 F.3d at 313.

[17] *See* 2022 WL 17423590, at *10-11.

8

The court declined to follow the Fifth Circuit's guidance in *Camacho* that under the UCC, the timing of a sale turns on when the seller completes performance and not on financing arrangements. The court reasoned that "*Camacho* [is] not binding" on a Texas court and commented that it did "not find *Camacho* instructive."[18]

The court went on to hold that "Ford did not conclusively establish the 'date of the sale' from which section 16.012(b)'s claimed protection ran".[19] The court relied on Texas Rule of Civil Procedure 166a(c), which affirms that a traditional summary judgment "may be based on uncontroverted testimonial evidence of an interested witness . . . if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted."[20] The court concluded that neither Pascarella's nor O'Brien's testimony passes this test.

The court compared two passages from Pascarella's deposition testimony in *Camacho*.[21] In the first, Pascarella was asked about Ford's definition of release. He responded: "That's . . . the date the vehicle was shipped from wherever Ford had the vehicle to the dealer, and that's when essentially payment is due from the dealer for those vehicles."[22]

---

[18] *Id.* at *10. The court also distinguished *Camacho* on the grounds that "it involved evidence pertaining to the particular truck sale before that court" and "because it was a federal case, Rule 166a(c)'s interested witness testimony requirements were not applied." *Id.*

[19] *Id.* at *11.

[20] TEX. R. CIV. P. 166a(c).

[21] 2022 WL 17423590, at *10.

[22] *Id.* at *6.

9

Later, while questioning Pascarella about information on the Mini 999 report for the truck at issue in that case, counsel asked Pascarella, "When was the payment made in full?" Pascarella responded: "I don't know, other than based on the system the release date is the date the dealer is responsible for payment of the vehicle."[23] The court then described Pascarella's testimony as "unclear and inconsistent as to whether a 'release' can occur prior to payment."[24]

The court noted O'Brien's deposition testimony in this case that based on Ford's business records, including the Sales and Service Agreement, Ford receives payment for the vehicle on the release date, which was May 9, 2000, and which always coincides with the wholesale date.[25] The court then reasoned:

> To the extent Ford asserts Mr. O'Brien's testimony shows payment was made on May 9, 2000, because Ford "always" receives payment on the release date, the Sales and Service Agreement and the Vehicle Terms of Sale Bulletin both appear to allow for other payment arrangements and thus demonstrate contradictions and inconsistency as to that testimony.[26]

Based on this analysis, the court reversed the trial court's summary judgment for Ford and remanded for further proceedings.[27] We granted Ford's petition for review.

---

[23] *Id.*

[24] *Id.* at *10.

[25] *Id.* at *8, 10.

[26] *Id.* at *10 (citing TEX. R. CIV. P. 166a(c)).

[27] *Id.* at *11.

## II

Section 16.012(b) provides that "a claimant must commence a products liability action against a manufacturer or seller of a product before the end of 15 years after the date of the sale of the product by the defendant."[28] We have never squarely addressed Section 16.012(b), but we have acknowledged it as a statute of repose.[29] "[T]he purpose of a statute of repose is to provide absolute protection to certain parties from the burden of indefinite potential liability."[30] The statute sets "an absolute cut-off point",[31] without which "professionals, contractors, and other actors would face never-ending uncertainty as to liability for their work."[32] The "practical upside" of a statute of repose "is to prevent defendants from answering claims where evidence may prove elusive due to unavailable witnesses (perhaps deceased), faded memories, lost or destroyed records, and institutions that no longer exist."[33]

Ford argues that the court of appeals erred by requiring Ford to prove the exact date on which it received full payment for the Explorer and that the court compounded that error by construing Ford's witness testimony to be inconsistent when it is not. Parks argues that for a

---

[28] TEX. CIV. PRAC. & REM. CODE § 16.012(b).

[29] *Methodist Healthcare Sys. of San Antonio, Ltd. v. Rankin*, 307 S.W.3d 283, 289 & n.35 (Tex. 2010); *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009).

[30] *Rankin*, 307 S.W.3d at 287 (quotation marks omitted) (quoting *Galbraith Eng'g*, 290 S.W.3d at 866).

[31] *Id.* at 284.

[32] *Id.* at 286.

[33] *Id.* at 287.

defendant to obtain judgment under Section 16.012(b), it "must maintain records" that prove "whether a sale occurred and when the price was paid" and that Ford's evidence here is inadequate under Rule 166a(c). We agree with Ford.

The parties agree that the Fifth Circuit's *Erie* guess[34] about the meaning of *sale* in Section 16.012(b) is correct. We too agree with the Fifth Circuit's analysis. *Sale* means the transfer of title or property for a price.[35] The court of appeals assumed—it cited no authority for this proposition, nor does Parks—that money must actually change hands before a sale is completed. But there is no textual basis in Section 16.012 for that assumption,[36] and it is incompatible with other Texas law.

The sale of an automobile from manufacturer to dealer is governed by Chapter 2 of the UCC.[37] Section 2.106(a) of the UCC defines

---

[34] *See Camacho*, 993 F.3d at 311 ("In applying Texas law, we are bound by the Texas Supreme Court's decisions. But if that Court has not considered an issue, we make an '*Erie* guess' about how it would rule." (footnote omitted) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938))).

[35] TEX. BUS. & COM. CODE § 2.106(a); *Sale*, BLACK'S LAW DICTIONARY, *supra* note 12; *see Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101, 108 (Tex. 2021) (noting that "the common meaning of seller" is "someone who parts with title for a price"); *Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 42 (Tex. 2020) (relying on *Black's* definition of *sale* when construing the undefined term *sold* in Section 171.1012(a)(1) of the Tax Code).

[36] As the Fifth Circuit recognized, we are a "text-centric Court". *Camacho*, 993 F.3d at 311. One cardinal rule of a text-centric court is that it must "'not judicially amend a statute to add words' that are not there." *Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 435 (Tex. 2023) (alteration omitted) (quoting *Jones v. Liberty Mut. Ins. Co.*, 745 S.W.2d 901, 902 (Tex. 1988)).

[37] *See* TEX. BUS. & COM. CODE § 2.102 ("Unless the context otherwise requires, this chapter applies to transactions in goods . . . ."); *id.* § 2.105(a)

a sale as "the passing of title . . . for a price" and then cross-references Section 2.401.[38] Section 2.401, in turn, states in subsection (b) that unless the parties agree otherwise, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, *despite any reservation of a security interest*".[39] A security interest "secures payment or performance of an obligation"[40] and is discharged when the buyer's payment or performance is complete. Section 2.401(b) thus sets a default rule that a sale is complete when the seller performs, even if the buyer has not made full payment.

The UCC is consistent with blackletter contract law. A treatise written two centuries ago equates "for a price" with an agreement about price or other consideration, which distinguishes a sale from a gift or barter:

> A sale is a transfer of the absolute title to property for a certain agreed price. It is a contract between two parties, one of whom acquires thereby a property in the thing sold, and the other parts with it for a valuable consideration. If the property in any commodity be voluntarily transferred without a valuable consideration, it is a gift; if one article be exchanged for another, it is a barter; but a sale takes place only, when there is a transfer of the title to property,

("'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities . . . [,] and things in action.").

[38] *Id.* § 2.106(a).

[39] *Id.* § 2.401(b) (emphasis added).

[40] *Id.* § 1.201(35).

for a price.[41]

We have applied the timing rule of Section 2.401(b) in a common-law context. In *Gulf Insurance Co. v. Bobo*,[42] Avett agreed to sell his truck to Havens for the amount that Avett still owed on it. Avett delivered the truck to Havens, and the parties were to meet at the bank three days later to arrange the refinancing. The day before the bank meeting, Havens wrecked the truck, injuring the plaintiffs. The issue in their lawsuit was whether Havens was covered as an additional insured under Avett's insurance policy. We held that Havens was not covered under Avett's policy because Havens was the owner of the truck at the time of the crash. We explained:

> After agreeing to the terms of the sale, . . . and taking possession of the pickup, Havens acquired the right to possession and the power to control the use of the vehicle. *At that point there was a completed contract which Avett had performed by delivering the truck in exchange for the consideration of Havens' promise to pay* Avett's debt at the bank . . . .[43]

We added that "if Havens failed to complete performance by refinancing the truck" in accordance with the parties' agreement, their contract would be "subject to re[s]cission".[44] But the possibility of rescission did not mean the sale was never completed.

---

[41] WILLIAM W. STORY, A TREATISE ON THE LAW OF SALES OF PERSONAL PROPERTY § 1, at 1 (1853), *quoted in Sale*, BLACK'S LAW DICTIONARY, *supra* note 12.

[42] 595 S.W.2d 847 (Tex. 1980).

[43] *Id.* at 848 (emphasis added).

[44] *Id.*

Thus, under both the UCC and the common law, a sale can—and often does—occur before payment is made. The court of appeals erred by imposing on Ford the burden of proving the date that Town East paid Ford for the Explorer. As the Fifth Circuit observed in *Camacho*, "the way the dealership financed the purchase is irrelevant to whether a sale occurred."[45] And because the timing of a sale does not turn on the date of payment, if there is any inconsistency in Ford's evidence regarding the timing of Town East's payment to Ford for the Explorer, that inconsistency is immaterial and not a basis for denying or reversing summary judgment.[46]

Statutes of repose operate to relieve defendants of the burden of

---

[45] 993 F.3d at 313.

[46] Because this case does not turn on the court of appeals' Rule 166a(c) analysis, we need not address Ford's argument that Parks waived her challenge to Ford's evidence under that rule by not securing a ruling on her objection in the trial court.

We note, however, that we find the court of appeals' Rule 166a(c) analysis unpersuasive. The court reasons that Pascarella's testimony that a dealer is responsible for payment on a vehicle's release or shipping date is inconsistent with his testimony that the Mini 999 report does not reflect when payment for a vehicle is made in full. *See* 2022 WL 17423590, at *10. We do not see any inconsistency there. In the first instance, Pascarella is testifying about the usual course of Ford's business operations, and in the second instance, he is testifying that specific information is not shown on a specific document.

It is the same with O'Brien's testimony. Without pointing to any specific language, the court reasons that the Sales and Service Agreement and the Vehicle Terms of Sale Bulletin "appear to allow for other payment arrangements", which, the court says, conflicts with O'Brien's testimony that payment is made on the release date. *See id.* But these documents are consistent with O'Brien's testimony. Paragraph 11(a) of the Agreement says that "[p]ayment . . . shall be in accordance with the . . . Bulletin." Part I(A) of

15

defending claims "where evidence may prove elusive due to . . . lost or destroyed records".[47] So while Ford was able to produce documentary evidence of the Explorer's sales date here, a defendant will not always have such evidence and need not prove an exact sales date to be entitled to judgment. It is enough for the defendant to prove that the sale must have occurred outside the statutory period.[48]

Ford's evidence easily meets this test. The Mini 999 report establishes that Ford released and shipped the Explorer to Town East in May 2000. Parks filed suit 16 years later in May 2016. Pascarella and O'Brien each testified that title to a vehicle is transferred to the dealership upon the vehicle's release and delivery to the carrier. Ford's Sales and Service Agreement and Vehicle Terms of Sale Bulletin

---

the Bulletin states that "[t]he Dealer shall pay the Company . . . on delivery of the Vehicle to the Dealer or the carrier, whichever occurs first". The evidence establishes that a vehicle's release, delivery to the carrier, and delivery to the dealer all occur within a few days' time. If the court is referring to the statement in paragraph 11(b) of the Agreement that "the Company shall retain a security interest in and right to repossess any product until paid therefor", that language does not conflict with O'Brien's testimony about how Ford's wholesale transactions work and is not favorable to Parks. If anything, the security-interest provision gives rise to the inference that Town East timely paid Ford because, if it had not, Ford would have repossessed the Explorer before it was transferred to retail customer Stewart the following month.

[47] *Rankin*, 307 S.W.3d at 287.

[48] *See Draughon v. Johnson*, 631 S.W.3d 81, 89 (Tex. 2021) (stating, in the analogous context of a statute-of-limitations defense, that a defendant must prove "that the plaintiff brought its suit later than the applicable number of years" after the cause of action accrued); *Burdett v. Remington Arms Co.*, 854 F.3d 733, 736-737 (5th Cir. 2017) (affirming summary judgment for a gun manufacturer under Section 16.012(b) where the parties were unaware of the date the manufacturer sold the rifle, but the plaintiff bought it from a retailer more than 15 years before filing suit).

establish that a dealer is required to pay money in exchange for receiving a vehicle—the exchange is not a gift or barter—and confirm that title to a vehicle passes to the dealer when the vehicle is delivered to the carrier or dealer, whichever occurs first. None of this evidence was controverted. Ford is entitled to summary judgment.[49]

* * * * *

We reverse the court of appeals' judgment and render judgment for Ford.

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** June 7, 2024

---

[49] Parks complains that Ford argued in its first summary-judgment motion that the relevant sales date for Section 16.012(b) is the date of the dealership's sale to a retail customer, and she suggests that this misstep was somehow fatal to Ford's repose defense. It wasn't. Ford's first motion can indeed be read to urge judgment in its favor based on the date that Town East sold or leased the Explorer to customer Stewart, but statutory interpretation is an issue of law, not a factual matter subject to Rule 166a(c). And though Ford's motion might have benefitted from a closer reading of the statutory text, the evidence Ford attached to that motion nonetheless establishes Ford's entitlement to summary judgment. A vehicle must be sold by its manufacturer before a customer can take possession of it, and Ford's evidence demonstrates that a customer was in possession of the Explorer more than 15 years before this suit was filed. *See Burdett*, 854 F.3d at 736 ("[T]he parties are unaware of the date Remington first sold the rifle. However, given that Burdett purchased it from a retailer in Georgia in approximately 1998, the date of the rifle's first sale was undoubtedly prior to 1998."). Parks did not even contest Ford's first motion when it was filed. The trial court's first order granting summary judgment for Ford was correct.

17